# Irwin *versus* Covode.

1. The statutes of Pennsylvania in relation to *waste* forbid to tenants for life such acts as at common law constitute waste, except they be such, as in the judgment of the Common Pleas and according to the terms of the Act of 1848, are requisite to "*the reasonable and necessary use and enjoyment*" of the estate.

2. At common law the working of *open* mines by a tenant for life is not waste (see Neel *v.* Neel, 7 *Harris* 323); and in Pennsylvania, whilst the right of possession is unquestioned, the working of open mines by a tenant for life is not waste.

3. Though a Court, by virtue of its common law powers, might restrain unskilful mining and wanton injury to the inheritance by a tenant for life; yet not such mining as is subject to no other objection than its liability to exhaust the mine.

4. If our Courts under their Chancery powers may direct an account between tenants for life and those in remainder as to coal mined by the life tenant, yet *estrepement* is not the remedy for obtaining relief in such a case.

5. A tenant for life, claiming under a will, sold to a coal company all her right, title and interest in the coal in the land, without limit as to the quantity of coal to be taken therefrom :

It was *Held* that *estrepement* did not lie in favour of those entitled in remainder, to restrain the Company from working largely, for sale, a mine which had been worked during the life of the testator for the use of the farm and for sale in the neighborhood.

6. The testator, after devising to his wife the one-third part of the net proceeds of the rents, issues and profits of certain real estate during her natural life, devised to his son and daughter all her real estate not otherwise devised; and directed that in case of the death of either of the children before attaining the age of twenty-one years, without lawful issue, the said real estate should go to the survivor :

The daughter died *first*, in her minority and without issue, and the son afterwards died, also in his minority and without issue :

It was *Held* that there being cross-remainders in fee, on the death of the sister the brother took her share not as *her heir* at law, but under the will of the testator; and on the death of the son without issue, the *half* brothers and sisters of the testator could not take from the son, because they were not of the blood of the ancestor, the testator. But the children of a deceased sister of the *whole* blood of the testator, being of his blood, took the estate on the death of the son.

ERROR to the Common Pleas of *Westmoreland county*.

This was a writ of estrepement, issued at the instance of John Irwin and others against John Covode and others, composing the Westmoreland Coal Company, to restrain them from committing waste, by mining for sale large quantities of coal, in a tract of land in which the plaintiffs alleged they owned the remainder in fee, admitting that Martha Hughes, formerly the widow of Hum-

[Irwin *v.* Covode.]

phrey Fullerton, under whom the defendants claimed, had *a life estate* in the land. The proceeding was under the Act of 10th April, 1848, in regard to waste, which extended the provisions of the Act of 29th March, 1822, to estates and tenants *for life.*

A case was stated, in which the facts, as follows, were agreed upon to be considered on the hearing of a motion to dissolve the writ of estrepement.

1. Humphrey Fullerton acquired the land. He died 29th January, 1835, after having made his last will, dated 31st May, 1834, approved 18th March, 1835, in and by which he devised to his widow Martha, one-third of his real estate for life, and all the residue to his two children, William and Hannah, or the survivor of them in fee. They were his only children.

The provision in the will, with respect to the children, was— "And in case of the death of either of my said children, before attaining the age of twenty-one years, without lawful issue, I devise and bequeath all the real and personal estate of which I may die possessed, herein bequeathed to them, to the survivor."

The case proceeded as follows :—

Hannah died intestate, without issue, and in her minority, on 2d October, 1836; and William also died intestate, without issue, and in his minority, on the 2d October, 1844. Neither were ever married. Martha (the widow) married the Rev. Watson Hughes, on 6th September, 1836, and they had, at the death of William Fullerton, two children, Ann Hughes and Harriet W. Hughes, who are yet in full life, as well as their father and mother. Humphrey Fullerton left a sister *of the whole blood*, Mrs. Jane Irwin, who died 23d February, 1836, leaving *the plaintiffs in this proceeding* as *her* heirs at law. He also left brothers and sisters of *the half-blood*, some of whom are yet in full life. The defendants are a coal company, with a capital stock of $500,000, and claim the right to mine, take and carry away the coal from the tract of land described in the writ, by virtue of articles of agreement with Rev. W. Hughes and wife. The defendants have constructed a railway over the land, and have opened a drift through the same, and were at the time of the issuing of this writ, mining and taking and carrying away the coals from the same. This mine had been opened, and worked to procure coals for the use of the farm, and for sale in the neighborhood in the lifetimes of Humphrey Fullerton and of his children. But the defendants have opened a new drift into the same mine, near the old one, and are now working both drifts.

By the article of agreement, W. Hughes and wife agreed to sell all their right, title, and interest to the coal in the lands referred to. The sum of $140 per acre was to be paid for a part of the coal, and $70 per acre for another part; and the payments were

to average $500 per annum, whether the coal was taken out or not.

The writ of estrepement was dissolved by the Court; which was assigned for error.

By the Act of 10th April, 1848, it was enacted that the provisions of the Act of 1822, to prevent waste in certain cases, are extended so as to embrace and be applicable *to estates and tenants for life;* but it is provided that no tenant or tenants for life shall hereby be restrained from the reasonable and necessary use and enjoyment of the land and premises in his, her, or their possession; and that the Court of Common Pleas shall have power to inquire into and determine the nature and extent of said use and enjoyment, upon any motion to dissolve said writ.

*Foster,* for plaintiff in error.—As to the title. Though, by the Intestate Act of 1833, half-blood, in certain cases, may inherit, they must be of the blood of the ancestor from whom the estate came : 5 *Wharton* 477, Baker *v.* Chalfant. The half-blood in this case are not the blood of the testator—the plaintiffs are.

As to the question of *waste.* Waste is the spoil or destruction of the estate. Whilst under the Act of 1848 tenants for life may have "*the reasonable and necessary use and enjoyment*" of the premises, they are not to strip the property of its substance or destroy it. In England tenants for life may work open mines; because, *there* there is no danger of destroying the mine; their coal beds are more disturbed, often vertical; but in this case the mine is horizontal, there being but one vein usually worked and which may be exhausted. In this case the part worked is more valuable than the rest. In the case of Neel *v.* Neel, 7 *Harris,* the Act of 1848 is not referred to. The plaintiffs did not object to the life tenant using the mine drift, formerly opened to procure coal for her use or for sale in the neighborhood, as had been done in the lifetime of the testator, but it is complained that the use attempted is neither necessary nor reasonable.

*Cowan,* with whom was *McKinney,* for defendants in error.— It was alleged that the testator devised to his son and daughter the same estate they would have had if he had died intestate; they therefore took by descent and not by the devise : 1 *Powell on Devises* 241. It was therefore said, that on the death of the daughter *her half* descended to the son, and upon his decease such half went to his half-sisters, the children of his mother by her second husband. This case is not within the proviso to the 9th section of the Act of 1794, as the *son* is the propositus as to that half. The children of the widow by her second husband are of the blood of the son and daughter of Fullerton, the testator, as being the issue of the same mother. Per STORY, J., in the case

[Irwin v. Covode.]

of Gardner v. Collins, 2 *Peters* 86, a half-brother or sister is of the blood of the intestate, for each of them has some of the blood of a common parent in his or her veins.

The tenant for life had the right to work the coal mines which had been opened during the life of her first husband, because, by the opening of the mine it became part of the profits of the land: *Cro. Eliz.* 683; 1 *Taunton* 402; 1 *Randolph* 258; 2 *P. Wms.* 288; Neel v. Neel, 7 *Harris* 323; 1 *Cowen* 460. In 10 *Pick.* 460, it was held that not only the portion of a slate quarry which had been actually dug, but the whole extent of the quarry was to be considered as opened.

The opinion of the Court was delivered by

WOODWARD, J.—The working of open mines by a tenant for life is not waste, either at common law or under our Acts of Assembly. But under the latter, it is said, such working must be limited to "a reasonable and necessary use and enjoyment." These words first made their appearance in the proviso to the Act of 10th April, 1848. That Act was supplementary to the Act of 29th March, 1822, which gave remedy by estrepement to owners of lands leased for years or at will, to purchasers at sheriffs' sales, and to mortgage and judgment-creditors, to prevent "*waste to the freehold;*" but there was no attempt to define what should constitute waste to the freehold. The object of the Act of 1848 was to extend these provisions to tenants for life, and to give remainder-men the same remedies that landlords, purchasers, and creditors enjoyed, but the proviso was added as a saving clause, "that no tenant or tenants for life shall be hereby restrained from the reasonable and necessary use and enjoyment of the land and premises in his, her, or their possession; and that the Court of Common Pleas shall have power to inquire into and determine the nature and extent of said use and enjoyment upon any motion to dissolve said writ." Exactly the same saving clause in behalf of mortgagors was introduced into the Act of 22d April, 1850, extending the Act of 29th March, 1822, for the protection of mortgagees after judgment recovered.

The substance of this legislation is, that tenants for life and mortgagors shall not commit waste to the freehold, but may have reasonable use of their estates, the extent of which is to be determined by the Court of Common Pleas. As the statutes do not define the legislative idea of "waste to the freehold" we must go to the common law for that, and then we understand all such acts to be forbidden by the statutes as at common law constitute waste, except they be such as are necessary, in the judgment of the Common Pleas, to the reasonable use and enjoyment of the estate. But, at common law, as we have said, the working of *open* mines by a tenant for life was never accounted waste. This was very

fully shown in Neel *v.* Neel, 7 *Harris* 323. It would seem to follow, then, that neither the restraining nor the enabling clauses of our legislation have any application to open quarries, mines, &c.

It is apparent from the Act of 1803, and its supplement of 1833, that the legislature understood the working of open mines and quarries was not waste, for the first of these Acts having given plaintiffs in pending ejectments the writ of estrepement to prevent " *waste and destruction,*" the Act of 1833 defines these words to mean " quarrying and mining and all such other acts as will do lasting injury to the premises;" but the proviso is, that as to quarries and mines opened before suit brought, the estrepement shall be dissolved on the defendants' giving security to the satisfaction of the Court for any damages the plaintiff may sustain. Thus it appears that, even after ejectment brought, open quarries and mines may be wrought, the contingent interests of the plaintiff being guarded by security. But, while the right of possession continues unquestioned in the tenant, there is no limitation or restraint whatever imposed by our Acts of Assembly on his working of open mines. It may, indeed, be doubted whether the saving clauses adverted to do not *empower* him to open mines and quarries, that he may have reasonable use and enjoyment of the premises, but this we do not decide, for it is not in the case.

The postulate of the plaintiffs is, that Mrs. Hughes, under whom and her second husband the defendants claim, had but a life estate, and that the plaintiffs are entitled to the reversion. Are they entitled to estrepement? The case admits that the mine had been opened and worked to procure coals for the use of the farm and for sale in the neighborhood, in the lifetime of Humphrey Fullerton. He devised to his widow the one-third part of the net proceeds of the rents, issues, and profits of his real estate during her natural life, and she having married Hughes, they sold to the defendants, a coal company, with a capital stock of half a million, " all their right, title, and interest to the coal in or on the lands known as the Fullerton estate." Under this grant the defendants entered, constructed a railway over the land, opened a new drift through the same, and were, at the time of the issuing of this writ, mining and taking and carrying away coals. The reversioners issued estrepement, and the Court on motion dissolved it. This is the error assigned.

The argument of the plaintiff's counsel is founded on the assumption that the Act of 1848 limits the defendants to a reasonable use and enjoyment of the estate; then it is said their means and preparations indicate a clear intention and capacity to take *all* the coals from the land during the continuance of the life estate, and that this is unreasonable. We have shown that this argument has no foundation in the statute. The words quoted from the proviso are not restrictive, but enabling and enlarging,

[Irwin *v.* Covode.]

a saving out of a disabling statute, so that if they were applicable to open mines, the consequence claimed would not follow; but they were not applicable.

As yet the legislature have prescribed no limitation to the use which a tenant for life may make of open mines. In virtue of their common law powers the Court might doubtless restrain unskilful mining and wanton injury to the inheritance, but not such proper mining as is subject to no other objection than its liability to exhaust the mine.

The profits of coal mines depend much on expensive preparations for working them, and in order to compensate this necessary investment, as well as to compete successfully with rival operations, a large amount of coal must be mined and sold. To deny a tenant for life the right to mine largely, would be to deny him the right to mine profitably—to shut him up to mining for his own fuel merely. If *he* cannot be restrained, and that he cannot was settled in Neel *v.* Neel, neither can his alienees. They possess his full right to mine and sell, and for these purposes to make new openings, to build railroads, and to supply all ordinary facilities. Nor are such improvements necessarily injurious to the remainder man, for the estate is liable to fall in at any moment, and when it comes to him he takes it with all that has been added to develope and improve it.

But it is said that on the western slope of the Alleghanies the seams of bituminous coal are so few and thin, that tenants for life, if permitted to introduce modern facilities for mining, would exhaust lands so held, and leave them ruined on the hands of those in succession. Should this happen, it would be no more than occurs in every life estate in chattels which perish with the using. So long as the estate is used according to its nature—*in formam doni*—it is no valid objection that the use is consumption of it; and it is no fault of the tenant that it is not more durable: Holman's Appeal, postea.

But if the objection urged be worthy of more consideration on account of the peculiarities of the great western coal field, it may be suggested that it is quite competent for the Legislature to provide for taking an account between tenants for life and those in remainder, that would do absolute justice to each. Similar statutory provisions exist now for tenants in common. It is possible indeed that the chancery powers already possessed by the Courts, might, by account, afford adequate relief; but however this may be, it is clear that estrepement is not the remedy, for that would deny him the enjoyment of the estate in the only practicable manner its nature will permit. This is the point we are called on to decide now, and it must be ruled against the plaintiff.

The other question presented by the case stated, is answered, we apprehend, by the provision in the will, apparently overlooked

in the argument, that in case of the death of either of the children of the testator, before arriving at twenty-one years of age, without issue, the estate should go over to the survivor. Here were cross-remainders in fee, and on the death of Hannah, William took the estate, not as her heir at law, but under the will of their father; and when William died without issue, the half brothers and sisters could not take from him because they were not of the blood of the ancestor—the testator. But the children of Mrs. Irwin, a deceased sister of the testator, were of his blood, and on them therefore the law cast William's estate when he died.

Judgment affirmed.